Eddie Mitchell TASBY et al.

v.

Dr. Nolan ESTES, General Superintendent, Dallas Independent School District, et al.

Donald E. Curry et al., Intervenors.

No. CA 3–4211–C

United States District Court,
N. D. Texas,
Dallas Division.

Dec. 11, 1975.

Edward B. Cloutman, III, Mullinax, Wells, Mauzy & Baab, Inc., Sylvia M. Demarest, Director, Dallas Legal Services Foundation, Inc., Dallas, Tex., Melvyn Leventhal, New York City, Vilma S. Martinez, Mexican American Legal Defense and Educational Fund, Inc., San Francisco, Cal., and Albert H. Kauffman, San Antonio, Tex., for plaintiffs.

Warren Whitham, Spafford, Gay & Whitham and Mark Martin, Strasburger, Price, Kelton, Martin & Unis, Dallas, Tex., for defendants except Highland Park ISD and Board of Trustees of HPISD.

Richard E. Gray, Jr., and Wm. T. Hankinson, Thompson, Knight, Simmons & Bullion, Dallas, Tex., for Highland Park ISD and Board.

Robert H. Mow, Jr., and Robert L. Blumenthal, Carrington, Coleman, Sloman, Johnson & Blumenthal, Dallas, Tex., for Donald Curry and others.

James G. Vetter, Jr., Elliott, Meer, Vetter, Denton, Bates & Cole, Dallas, Tex., for Oak Cliff Citizens.

N. Alex Bickley, City Atty., Dallas, Tex., for City of Dallas.

James T. Maxwell, pro se.

Martin Frost, Barber & Frost, and John W. Bryant, Dallas, Tex., for Dr. E. Thomas Strom and others.

E. Brice Cunningham, L. A. Bedford, Jr., and Fred J. Finch, Jr., Dallas, Tex., for Metropolitan Branches of NAACP.

James A. Donohoe and G. Duffield Smith, Jr., Gardere, Porter & DeHay, Dallas, Tex., for Brinegar and others.

## MEMORANDUM OPINION AND ORDER

WILLIAM M. TAYLOR, Chief Judge.

The issue presented to this Court is whether the Highland Park Independent School District (HPISD) should be included in a desegregation plan designed to remedy the dual school system found to exist in the Dallas Independent School District (DISD).

*Background*

In its decision of July 23, 1975, the Court of Appeals affirmed this Court's 1971 ruling that elements of an unconstitutional dual school system remained in the Dallas Independent School District (DISD), but remanded the case for the formulation of a desegregation plan which would insure the operation of a unitary system in the DISD. *Tasby v. Estes,* 517 F.2d 92 (5th Cir. 1975). On August 21, 1975, the plaintiffs filed their Second Amended Complaint and added as parties defendant the following suburban school districts in the metropolitan Dallas area:

(1) Carrollton-Farmers Branch Independent School District

(2) DeSoto Independent School District

(3) Duncanville Independent School District

(4) Highland Park Independent School District

(5) Irving Independent School District

(6) Lancaster Independent School District, and

(7) Wilmer-Hutchins Independent School District.

They alleged that these school districts operated their respective schools on a dual school system basis in the past and that vestiges of such operation remain in effect to date. Additionally, they alleged that the districts utilized student transfer procedures on an interdistrict basis with the DISD and/or each other, which fostered and continued the operation of unconstitutional dual school systems. Plaintiffs asserted that because of the alleged unlawful activities of the suburban school districts, each should be included in a desegregation plan formulated for the metropolitan area without regard to school district lines.

By September 15, all the suburban school districts had filed Motions to Dismiss. After a hearing on September 16, the Court determined that it did have jurisdiction to hold evidentiary hearings in accordance with *Milliken v. Bradley*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974), on the matter of consolidation, and overruled the various motions of the suburban districts.

On October 23 plaintiffs moved to voluntarily dismiss the Wilmer-Hutchins Independent School District from the suit, and such dismissal was ordered without prejudice. On October 28 plaintiffs moved to dismiss the Carrollton-Farmers Branch, DeSoto, Duncanville, Irving and Lancaster Independent School Districts from the suit, and the Court dismissed such districts without prejudice on October 30.

Thus there remained only the question of whether the Highland Park Independent School District (HPISD) should be consolidated with the DISD for the purpose of formulating a desegregation plan for the DISD. This issue was fully developed and presented to the Court in the hearing which began December 3. After carefully considering the evidence and the arguments presented, the Court has concluded that under the test laid down in *Milliken v. Bradley, supra,* the HPISD should not be included in a desegregation plan for the DISD.

*Legal Precedent*

The task presented to this Court is now, as it was in 1971, to adopt and implement a viable and constitutionally adequate desegregation plan for the DISD. In formulating a remedy to correct the condition in the DISD that offends the Constitution, the Court is guided by the teachings of the Supreme Court. In *Brown v. Board of Education*, 349 U.S. 294, at 300, 75 S.Ct. 753, at 756, 99 L.Ed. 1083 (1955) (*Brown II*), the Court held that

In fashioning and effectuating the decrees, the courts will be guided by equitable principles. Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs.

The Supreme Court further articulated the remedial power of the courts by stating in *Swann v. Board of Education*, 402 U.S. 1, at 16, 91 S.Ct. 1267, at 1276, 28 L.Ed.2d 554 (1971), that " . . . it is important to remember that judicial power may be exercised only on the basis of a constitutional violation," and that "[a]s with any equity case, the nature of the violation determines the scope of the remedy." That latest authoritative pronouncement by the Supreme Court as to the exercise of federal equity jurisdiction in school desegregation cases is *Milliken v. Bradley, supra.* Again the Supreme Court reiterated that

The controlling principle consistently expounded in our holdings is that the scope of the remedy is determined by the nature and extent of the constitutional violation. 418 U.S. at 744, 94 S.Ct. at 3127.

In *Milliken,* the Supreme Court was squarely presented with the question of when school districts could be consolidated

for the formulation of a desegregation plan, and the following test was laid down:

> Before the boundaries of separate and autonomous school districts may be set aside by consolidating the separate units for remedial purposes or by imposing a cross-district remedy, it must first be shown that there has been a constitutional violation within one district that produces a significant segregative effect in another district. Specifically it must be shown that racially discriminatory acts of the state or local school districts, or of a single school district have been a substantial cause of inter-district segregation. 418 U.S. at 745, 94 S.Ct. at 3127 (1974).

The District Court in *Milliken* had ordered the consolidation of 54 independent school districts in order to remedy the constitutional violation found to exist in the Detroit school district. The Supreme Court held that school district boundary lines may be "bridged," but not "casually ignored," since consolidation of the 54 independent school districts would present overwhelming problems of logistics, finance, administration and political legitimacy. Moreover, the Court recognized that the tradition of local control of public education is deeply rooted, and that this tradition should not be disturbed unless the districts to be joined had committed constitutional violations which had a substantial impact on segregation in the district for which the remedy was contemplated. This feeling is echoed by Justice Stewart in his concurrence:

> The opinion of the Court convincingly demonstrates . . . that traditions of local control of schools, together with the difficulty of a judicially supervised restructuring of local administration of schools, render improper and inequitable such an inter-district response to a constitutional violation found to have occurred only within a single school district. 418 U.S. 717, at 753, 94 S.Ct. 3112, at 3132.

The plaintiffs in this case have asked this Court to include the HPISD in a plan designed to correct the segregated system found in the DISD. According to the test enunciated in *Milliken,* the Court could do this only upon a finding that either

> (1) the HPISD is or was operating a dual school system which is or was a substantial cause of the segregation found to exist within the DISD,

or

> (2) the HPISD has committed unconstitutionally discriminatory acts of an inter-district nature which have had a significant segregative effect on the DISD.

Without a finding that constitutional violations having a *significant segregative effect* on the DISD have occurred, this Court has no power or authority to join the HPISD in a desegregation plan for the DISD.

### Operation of HPISD

The City of Highland Park was established in 1913, and the City of University Park in 1924. These two cities are known as the "Park Cities." The HPISD was created in 1914 pursuant to state law and has been in continuous existence to the present. Its boundaries are not coterminous with those of the Park Cities, but generally speaking it serves as the school district for residents of the Park Cities. The HPISD presently operates six schools—four elementary schools, one middle school, and one high school. The last school built by the HPISD was in 1949 and it presently has no new school sites or plans for the construction of new schools. The current enrollment is approximately 4,632 students.

Prior to the decision of the Supreme Court in *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the HPISD operated its schools on a segregated basis, as was required by Texas law. During this period, the HPISD did not operate separate schools for black children within its district, as there was never a sufficient number of black students to make it economically or practically feasible. The HPISD instead made arrangements with nearby school districts or private schools to accept its black students, and the HPISD paid their tuition.

Following the *Brown I* decision, the members of the Board of Trustees vocalized

their intention to "follow the law" when it had been clarified as to how they were to do so. There continued to exist, however, state laws which imposed requirements in the dismantling of a dual school system (for example, "H.B. 65" required the majority vote of all eligible voters before a district could desegregate). Failure to abide by these laws would result in loss of accreditation, loss of state funds, and other penalties. Thus from 1955–1958 the HPISD undertook a careful study of desegregation procedures in an effort to strictly comply with the law. When H.B. 65 was finally declared unconstitutional, the HPISD discontinued its past state-imposed policy of segregation. In August of 1958, the Board of Trustees instructed its superintendent to admit all students who lived within the district and requested enrollment, without regard to race, creed or color. They did, however, continue to allow resident black pupils who applied for a transfer to the DISD (and whose application was approved by the Texas Educational Agency) to do so. These transfers continued until 1961–62.

In *Brown I*, the Court held that

in the field of public education the doctrine of 'separate but equal' has no place. Separate educational facilities are inherently unequal. Therefore, we hold that the plaintiffs and others similarly situated . . . are, by reason of the segregation complained of, deprived of the equal protection of the laws guaranteed by the Fourteenth Amendment . . .

Because these are class actions, because of the wide applicability of this decision, and because of the great variety of local conditions, the formulation of decrees in these cases present problems of considerable complexity. 347 U.S. 483, at 495, 74 S.Ct. 686, at 692 (1954).

In dealing with these complexities, the Court held in *Brown II* that

School authorities have the primary responsibility for elucidating, assessing, and solving these problems; courts will have to consider whether the action of school authorities constitutes good faith implementation of the governing constitutional

principles. 349 U.S. 294, at 299, 75 S.Ct. 753, at 756 (1955).

■ This Court finds that the Board of Trustees acted in good faith in instructing the superintendent to admit all bona fide residents of the HPISD without regard to race, and that the implementation of this policy was sufficient to transform the HPISD into a unitary system.

The undisputed evidence shows that since the beginning of the 1958 school year, all resident black students who have applied for enrollment in the HPISD have been admitted. The number of black students to actually apply has been small: one elementary age student was enrolled in the 1962–63 school year, one elementary age student was enrolled in the 1964–65 school year, one middle school age student was enrolled in the 1972–73 school year, and one senior high school student, who was graduated from the HPISD after completing all requirements, was enrolled in the 1974–75 school year. Two resident black students enrolled in the 1975–76 school year and withdrew shortly thereafter, both for reasons of their own and having nothing to do with HPISD authorities.

■ The fact that the HPISD has enrolled only six resident black students in the past and has none presently enrolled does not make it an unconstitutional school system. As the Court noted in *Milliken,*

Disparity in the racial composition of pupils within a single district may well constitute a "signal" to a district court at the outset, leading to inquiry into the causes accounting for a pronounced racial identifiability of schools within one school system. 418 U.S. 717, note 19, 94 S.Ct. 3112 (1974).

The burden of proof is merely shifted to the school authorities to show that the school district operates in a racially nondiscriminatory manner. This shifting of the burden of proof "is a very different matter from equating racial imbalance with a constitutional violation calling for a remedy." Ibid.

In this case the school authorities have satisfied the Court that for over 12 years the HPISD has been operated in a non-dis-

criminatory manner. The Court holds that although the HPISD was created in 1914 as a "dual" system in the sense that whites would attend schools in the HPISD and blacks in nearby districts, the HPISD has completely dismantled its "dual" nature and has since 1958 operated a unitary school system.

Since it has been found that the HPISD operated a dual school system until 1958, the Court must determine whether this constitutional violation had a significant segregative effect on the DISD. Stipulated facts in this case show that HPISD paid tuition to the DISD for the following school years and number of students per year:

| School Year | Number of Black Students For Which Tuition Was Paid |
|---|---|
| 1954–55 | 9 |
| 1955–56 | 11 |
| 1956–57 | 6 |
| 1957–58 | 5 |
| 1958–59 | 5 |
| 1959–60 | 5 |
| 1960–61 | 5 |

During the same years, DISD had the following number of white and black students residing in its district per the school census:

| School Year | Number of White Students per Census | Number of Black Students per Census |
|---|---|---|
| 1954–55 | 86,589 | 16,658 |
| 1955–56 | 92,971 | 18,329 |
| 1956–57 | 98,509 | 20,355 |
| 1957–58 | 102,516 | 22,083 |
| 1958–59 | 108,115 | 23,963 |
| 1959–60 | 114,792 | 25,782 |
| 1960–61 | 118,531 | 27,523 |

A study of these figures convinces this Court that the black students who resided in the HPISD and attended the DISD during the years 1954 through 1960 had no effect on the racial composition of the DISD during those years, and certainly not a *significant* segregative effect. Moreover, the Court finds that such transfers more than 12 years ago have no effect whatsoever on the racial composition of the DISD today.

■ This Court therefore holds that the constitutional violation of operating a dual school system until 1958 had no segregative impact on the DISD, and thus does not meet the *Milliken* standard for consolidation. The Court holds as well that the HPISD is presently operating a unitary school system in which no vestiges of the former dual system remain.

*Interdistrict Transfers*

Plaintiffs also contend that the HPISD committed unconstitutionally discriminatory acts of an interdistrict nature in that they allowed whites, but not blacks, to transfer into the HPISD. Under the *Milliken* test, these interdistrict transfers, if in fact they were of an unconstitutionally discriminatory nature, must have had a significant segregative effect on the DISD before this Court could join the HPISD for purposes of desegregating the DISD.

The evidence in this case showed that, with two exceptions, the HPISD has admitted only resident students to its schools. The first exception was for students living in the "Ninth Installment of Highland Park." This is a seven-block area which was the last area to be developed in Highland Park, being developed in the late 1930's and early 1940's. The area was and is included within the City of Highland Park but not within the boundaries of the HPISD. The second exception was for students who had begun their education as residents of the HPISD but had subsequently moved out of the district. These students were accepted as transfers on a tuition basis.

The policy of enrolling HPISD residents only, with these two exceptions, remained in effect through the year 1971–72. The transfer students who attended the HPISD did so in accordance with applicable laws, and with the approval of the Texas Education Agency (TEA) and the district in which each resided. Although none of these students were black, there were Mexican-American students among these transfers, and after 1958 the HPISD applied this transfer policy to black students as well.

It was stipulated that the transfers into the HPISD during the school years 1966 through 1971 were as follows:

| School Year | Net Transfers Into HPISD |
|---|---|
| 1967–68 | 111 |
| 1968–69 | 91 |
| 1969–70 | 96 |
| 1970–71 | 97 |
| 1971–72 | 86 |

During the same period the population of the DISD was stipulated as follows:

| School Year | White | Spanish | Black |
|---|---|---|---|
| 1967–68 | 112,184 | | 43,816 |
| 1968–69 | 96,900 | 12,868 | 48,489 |
| 1969–70 | 96,300 | 13,579 | 52,445 |
| 1970–71 | 94,300 | 13,885 | 55,551 |
| 1971–72 | 86,641 | 15,021 | 55,565 |

When computations are made to determine the net effect of having the transferring students remain in the DISD for those years rather than transfer into the HPISD (using the assumption that all of these transfer students are white and would have gone to the DISD rather than private schools, so as to determine the maximum effect), the following results are seen:

| School Year | Net Effect-Rise in % of Whites in the DISD |
|---|---|
| 1967–68 | .02% or 2/100 of 1% |
| 1968–69 | .019% or 19/1000 of 1% |
| 1969–70 | .02% or 2/100 of 1% |
| 1970–71 | .026% or 26/1000 of 1% |

The Court holds that as a matter of law these transfers had de minimus to no effect upon the racial composition of the DISD during the years in question, and certainly none since the transfer policy was ended in 1971. These transfers in no way have had a significant or substantial impact on the DISD, as is required by *Milliken* before this Court could join the HPISD to the DISD.

*Balancing of Interests*

As the Supreme Court stated so cogently in *Milliken*:

No single tradition in public education is more deeply rooted than local control over the operation of schools; local autonomy has long been thought essential both to the maintenance of community concern and support for public schools and to quality of the educational process. . . . Thus, in *San Antonio School District v. Rodriquez*, 411 U.S. 1, 50, 93 S.Ct. 1278, 1305, 36 L.Ed.2d 16 (1973), we observed that local control over the educational process affords citizens an opportunity to participate in decision-making, permits the structuring of school programs to fit local needs, and encourages "experimentation, innovation, and a health competition for educational excellence."

The evidence in this case established that the residents of the Park Cities take great pride in their schools and in the high quality of education which their students receive. The Parent-Teacher Association is integrally involved in the mechanics of operating the schools, including running the school cafeterias. As a court sitting in equity, this Court holds that the interest of the residents of the Park Cities to have their own school district where they can experiment, innovate, and strive for academic excellence far outweighs the interests of the plaintiffs to add approximately 4600 school children to the DISD of approximately 145,000 school children. Moreover, under the equitable guidelines established in *Milliken,* the addition of such students would be improper in this case.

Post-*Milliken* lower court cases have recognized that the tradition of local control of the schools can be ignored only when there have been constitutional violations producing the significant segregative effects which *Milliken* required. See e. g. *Evans v. Buchanan,* 393 F.Supp. 428 (D.Del.1975), aff'd 423 U.S. 963, 96 S.Ct. 381, 46 L.Ed.2d 293. Thus, interdistrict remedies have been ordered where school district remedies have been ordered where school district boundaries were altered with significant segregative effect, where the constitutional violations of adjoining school districts currently contributed to segregation within each district, where transfers having a significant segregative effect were continuing at the time of trial, and where "white flight" from an urban district guilty of constitutional violations to outlying districts guilty of constitutional violations was occurring. See *Newburg Area Council, Inc.*

*v. Board of Education,* 510 F.2d 1358 (6th Cir. 1974), cert. denied, 421 U.S. 931, 95 S.Ct. 1658, 44 L.Ed.2d 88 (1975); *United States v. Missouri,* 515 F.2d 1365 (8th Cir. 1975); *United States v. Board of School Commissioners,* 503 F.2d 68 (7th Cir. 1974); *Evans v. Buchanan, supra.* In this case, none of the above violations are present, nor any others having a substantial impact on the DISD or its "dual" character.

### Covenants and Ordinances

■ Plaintiffs introduced evidence of racially restrictive resolutions and racially restrictive deed covenants in the Park Cities. This evidence is not pertinent to the issue at hand. Such resolutions and deed covenants are private action, not state action or action of the HPISD. These restrictive covenants at one time were common throughout Dallas. However, since the time that the Supreme Court ruled such restrictions unconstitutional in *Shelley v. Kraemer,* 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948), they have been ignored in land transactions and by the courts. These covenants are nothing more than an historical artifact without current significance or effect.

■ Plaintiffs also introduced evidence of single-family zoning ordinances in the Park Cities. However, these ordinances constitute no violation of the constitutional rights of any citizen, *Village of Belle Terre v. Boraas,* 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974), and therefore they have no bearing on issues in this case.

Plaintiffs' petition to include the HPISD in a plan for the DISD is accordingly denied.