**HULL, Hopson, Richardson, Franklin, et al., Plaintiffs,**

**Jonathan Hankins, by his father and next friend John Hankins, et al., Etc., Intervenors–Appellants,**

v.

**The QUITMAN COUNTY BOARD OF EDUCATION, et al., Defendants–Appellees.**

**No. 91–1903.**

United States Court of Appeals, Fifth Circuit.

Sept. 2, 1993.

---

**11.** Because we have affirmed the JNOV, it is unnecessary for us to address the conditional grant of a new trial.

Ronald W. Lewis, Franklin Turner, Law Offices of Ronald W. Lewis, Oxford, MS, for Jonathan Hankins, et al.

Azki Shah, Clarksdale, MS, for Bd. of Educ. of Quitman County, MS.

Before JONES and BARKSDALE, Circuit Judges and JUSTICE *, District Judge.

EDITH H. JONES, Circuit Judge:

When the school board of Quitman County, Mississippi, voted unanimously to close its only remaining public school with a significant white student population, both black and white parents of students at the school complained. Their school, Crowder Elementary and Junior High, was the most academically proficient and racially balanced school in the district at that time. It was also by far the smallest school in a district chafing from serious financial problems. The district court refused to enjoin Crowder from being closed. The question before us is whether the district court abused its discretion in

* District Judge of the Eastern District of Texas, sitting by designation.

holding that the school board could choose to close Crowder consistent with its duty under a federal desegregation order. Unpalatable as that choice seems from an educational standpoint, this court sits not to review the wisdom of a school board's actions, but their constitutionality. We affirm the district court's order.

### I.

The public schools of Quitman County have been operating under a federal court desegregation order since 1969. A 1986 court order permitted the school district to close three of its four formerly all-white schools, Lambert, Marks, and Sledge.[1] Crowder, the fourth, remained open. The district continues to operate three other combined elementary and junior high schools, Southside, Westside, and Falcon, as well as Quitman County High School.

No doubt a major reason schools were closing is that the county's total population fell from 15,888 in 1970 to 10,490 in 1990. The racial mix remained relatively stable. Of those aged 17 and under in 1970, 33% were white and 67% were black. In 1990, the proportions were 29% and 71%, respectively. But because disproportionately white private schools sprang up after the 1969 desegregation order, by 1990, whites comprised a bare 10% of the district's 2,164 students.

At Crowder, whites remained a majority of the student population. In March, 1991, when the school board voted to close the school, it had 110 white students (73%) and 40 black students (27%). By contrast, the other three elementary and junior high schools in the district had much larger and overwhelmingly black student populations. At Southside there were 523 black students (90%) and 58 white students (10%); at Westside, 434 black (94%), 28 white (6%); and at Falcon, 436 black (98%), 9 white (2%). At Quitman County High School, 509 students were black (97%) and 17 were white (3%).

Crowder's enrollment was declining steadily, from 238 students in 1986 to 150 students by 1991. At the district court's hearing on whether to close Crowder, parents attributed this decline in part to uncertainty over whether the district would keep the school open. The school board had first publicly considered closing Crowder after receiving a consultant's recommendation in 1989.

Crowder's academic record is unmatched in Quitman County schools. Its students have fared better than all other students in the district on standardized tests. Its black students also scored significantly higher by standardized measures than other black students in the district.

In late 1990, faced with dire fiscal straits, the Quitman County School Board proposed closing Crowder and sending its students who chose to remain in the public schools elsewhere in the district. Ms. Sandra Biffle, the district's secretary, testified at the hearing below that closing Crowder would save the district $325,860.00, including savings in teachers' salaries, maintenance, insurance and repairs. Certain ambiguities and possible omissions from these calculations render uncertain the total amount saved. Nevertheless, the school district argued that its finances would be jeopardized unless it closed Crowder, and the district court agreed with this assessment.

Some of the district's savings from closing Crowder come from the expected loss of students who officials anticipated would choose to go to private school or would move to an adjoining public school district rather than transfer to one of the other public schools in Quitman County. Biffle stated that the district expected that Crowder's forty black students would transfer to one of the other three elementary or junior high schools, and nearly all of the 110 white students would drop out of Quitman County schools.

The school board failed explicitly to consider the effect of its decision to close Crowder

---

1. Apart from these orders, and another entered in 1972, the district court record is sparse. The 1986 order mandated the school board to submit annual reports to the district court to document its progress toward desegregation. The school board submitted its first—and last—report on October 8, 1986. At the hearing to consider closing Crowder, the district's attorney attributed this lapse to forgetfulness and a change of attorneys after 1986.

upon the district court's longstanding desegregation order. Superintendent Wright testified that the district considered only the potential financial benefit of closing Crowder, not its effect on desegregation. It has never been asserted, however, that the board, three of whose five members are black, decided to close Crowder for the purpose of hindering desegregation.

The appellants, plaintiff-intervenor families of black children attending Crowder, challenged the school district's decision in federal court, seeking a preliminary injunction barring closure of Crowder. On July 18, 1991, the district court denied the preliminary injunction. This appeal ensued.

## II.

■ Before a preliminary injunction may issue, the plaintiffs must show that (1) there is a substantial likelihood they will prevail ultimately on the merits, (2) there is a substantial danger they will suffer irreparable injury if an injunction does not issue, (3) the threatened injury outweighs any harm to the defendant resulting from the injunction, and (4) the injunction will not harm the public interest. *Roho, Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir.1990). The district court concluded that the appellants failed to meet any of these requirements. Whether the injunction was properly denied is tested under an abuse of discretion standard.[2]

■ The district court held that the plaintiff-intervenors failed to state a relevant constitutional claim. One black parent who testified at the hearing stated that he wanted

his child to continue attending school with white children.[3] Other plaintiff parents stated only that they preferred their children to attend Crowder because it was closer to home and a good school. The court construed these parents' position most generously as a request that it impose a duty on the school board to maintain a system that (a) reflects the racial population of Quitman County in each school and (b) discourages white flight from the schools that remain open. The district court correctly held that the first noted duty does not exist in desegregation law. *Swann v. Charlotte–Mecklenburg Bd. of Educ.*, 402 U.S. 1, 24, 91 S.Ct. 1267, 1280, 28 L.Ed.2d 554 (1971). We agree that the second duty, which might also be characterized as a duty not to perpetuate or re-establish a dual system, was not violated on the facts of this case.

■ The Supreme Court has stated that as long as a school district remains under the superintendence of a federal desegregation order, it has a duty "to take all steps necessary to eliminate the vestiges of the unconstitutional *de jure* system." *Freeman v. Pitts*, —— U.S. ——, ——, 112 S.Ct. 1430, 1443, 118 L.Ed.2d 108 (1992). Eliminating unconstitutional separate student attendance patterns has been a keystone of this remedy. *Freeman*, —— U.S. at ——, 112 S.Ct. at 1445.[4] The Supreme Court has recognized, however, that federal court injunctive power "may be exercised only on the basis of a constitutional violation," and that the "nature of the violation determines the scope of the remedy." *Swann v. Charlotte–Mecklenburg Bd. of*

2. In another case dealing with the school board's request for a district court order to consolidate schools, this court reviewed the order under the clearly erroneous standard. *Monteilh v. St. Landry Parish Sch. Bd.*, 848 F.2d 625, 632 (5th Cir.1988). *Monteilh* is harmonious with previous decisions of our court, *e.g. Copeland v. Lincoln Parish Sch. Bd.*, 598 F.2d 977, 981 (5th Cir.1979) and *United States v. Hendry County Sch. Dist.*, 504 F.2d 550, 554 (5th Cir.1974), which together reviewed the desegregative impact of school opening or closing as a factual finding and the court's decision to permit such actions under an abuse of discretion standard. *See, also, Harris v. Crenshaw County Bd. of Educ.*, 968 F.2d 1090, 1098 (11th Cir.1992). The procedural posture of this case, hence our standard of review, is similar because the court's order was

denominated as an order (and opinion) denying the preliminary injunction request of the plaintiff-intervenors against the Quitman County School Board.

3. The court observed that white children do attend the other schools in the county, though in much smaller numbers.

4. The Court has also considered factors such as a school system's faculty and staff make-up, transportation, extracurricular activities and facilities critical in determining whether the mandate of desegregation has been met. *Green v. New Kent County Sch. Bd.*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); *Freeman v. Pitts, supra, passim.*

*Educ.,* 402 U.S. at 16, 91 S.Ct. at 1276. Consequently, a district court may at some point decline to order "further remedies in the area of student assignments where racial imbalance is not traceable, in a proximate way, to constitutional violations." *Freeman,* —— U.S. at ——, 112 S.Ct. at 1446. The Court also observed that "with the passage of time the degree to which racial imbalances continue to represent vestiges of a constitutional violation may diminish, ..." *Id.* *Freeman* placed the burden of proof on the school district to show that a "current imbalance is not traceable, in a proximate way," to the prior constitutional violation. —— U.S. at ——, 112 S.Ct. at 1447. *Freeman* urged an intensely practical, fact-specific approach to these decisions, and it rejected the notion that "awkward," "inconvenient," or "even bizarre" measures must be employed to achieve racially balanced school assignments "in the late phases of carrying out a decree, when the imbalance is attributable neither to the prior *de jure* system nor to a later violation by the school district but rather to independent demographic forces." —— U.S. at ——, 112 S.Ct. at 1447. *Freeman* reinforced the Court's decision a year earlier to permit a district court to relinquish supervision under a desegregation decree if "the vestiges of discrimination [have] been eliminated to the extent practicable." *Board of Education of Oklahoma City v. Dowell,* 498 U.S. 237, 249, 111 S.Ct. 630, 638, 112 L.Ed.2d 715 (1991).

■ *Freeman* and *Dowell* might be technically distinguished from the case before us on the ground that those cases considered the circumstances under which federal court control of a school district may finally be relinquished. This appeal does not present exactly that issue, for Quitman County has not sought to terminate its desegregation case.[5] This court used to evaluate termination of desegregation decrees under the global inquiry whether the school district had achieved "unitary" status. *See, e.g., Mon-*

*teilh,* 848 F.2d at 629 and n. 7 (citing cases). *Freeman* and *Dowell* make clear, however, that there is no longer magic in the phrase unitary status, which had spawned much uncertainty and a conflict among the circuits. *See* Comment, 2 Seton Hall Const. L.J. 337 (1991). Following *Freeman,* the lower courts have discretion to terminate a desegregation case if a school board has consistently complied with a court decree in good faith and has eliminated the vestiges of past discrimination to the extent "practicable." *Freeman* created a framework in which equitable decrees will not remain in effect perpetually and school districts can be returned to local control. We believe the same considerations—good faith compliance, practicability of further desegregation, and local control—are also pertinent to determining whether a particular school board action, in a district that has long lived with a desegregation decree but failed to seek dismissal of the case, sufficiently *comports* with the goals of the decree. The tests of practicability and good faith should inform, as they did here, a district court's exercise of its equitable powers where a desegregation decree has been in effect for some years. Indeed, it would be peculiar if a school district such as Quitman County's could qualify for termination of its desegregation decree under *Freeman* and *Dowell* but, allegedly bowing to older precedents, could not adjust school boundaries to remedy a financial crisis.

But even if we rely upon caselaw that emphasized the duty to desegregate, there has been no hard and fast rule preventing legitimate school closings. The decision to open or close schools, like the reordering of student assignments in *Freeman* or *Dowell,* is often undertaken because of changing school populations. Facing this demographic problem in the context of school construction or consolidation decisions, our court has counselled that such decisions may not be used to perpetuate or reestablish the dual system, *Monteilh,* 848 F.2d at 631, quoting

---

5. The dissent takes us to task for applying *Freeman* and *Dowell* in what it believes to be a distinguishable situation, that of the closure of a school during an ongoing, albeit petrified, desegregation process, as opposed to termination of the federal decree. We believe those cases state

an approach to equitable desegregation decrees which does apply to this case to the extent and for reasons stated in the text. Inconsistently, the dissent eagerly cites concurring opinions from *Freeman* in support of its position.

*Swann, supra,* 402 U.S. at 21, 91 S.Ct. at 1278; *Davis v. East Baton Rouge Parish Sch. Bd.,* 721 F.2d 1425, 1435 (5th Cir.1983). On the other hand, there is no constitutional duty to achieve maximum desegregation or to achieve an ideal racial balance in the schools. *Monteilh,* 848 F.2d at 632. This court has also recognized limits imposed upon desegregation efforts by population changes and the reality of white flight, holding that "school officials who have taken effective action have no affirmative fourteenth-amendment duty to respond to the private actions of those who vote with their feet." *Ross v. Houston Independent Sch. District,* 699 F.2d 218, 288 (5th Cir.1983), citing *Pasadena City Bd. of Educ. v. Spangler,* 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976).[6]

■ Based on these principles, the Quitman County School Board had no duty to keep Crowder open in order to maintain one partially integrated school housing fewer than 7% of the district's students. Crowder's racial mix was a statistical fluke: even if the entire white school-age population of Quitman County had attended public school, they still made up only 29% of that population in 1990. No party has asserted that any of the Quitman County schools or their attendance zones were affected by deliberately discriminatory line-drawing at any time since the advent of the desegregation decree. No one has asserted either that the board ever violated the desegregation decree in any other way or that it was motivated by an intent to resegregate when it unanimously decided to close Crowder. Finally, appellants have not demonstrated that the district court's finding of financial necessity to close Crowder was clearly erroneous.

■ The next question is whether the board had the duty to close another elementary-junior high school or to seek another remedy for its financial problems in such a way as to maximize the impact on the schools' desegregation. While the duty to avoid actions that would deliberately reinvigorate segregation remains constant, a school board need not create financially impossible situations or engage in "heroic measures" to comply with that duty. *See Freeman,* —— U.S. at ——, 112 S.Ct. at 1447. Although the plaintiff-intervenors assert that the board could have moved more black children to Crowder, increasing its cost-effectiveness, they did not effectively challenge the board's emphatic denial that it could operate four elementary schools. Yet to keep Crowder open would require either that result or a closure of one of the other three schools, which would precipitate massive student relocations. Crowder's enrollment had been declining steadily for five years before the court's hearing on closure. The school board would have been striking in the dark, at best, to order one of the other three, much larger schools closed and to transfer hundreds of children around the county in the hope that white children would continue to attend an expanded Crowder.[7]

■ Quitman County does not offer the prospect of alternative methods for desegregation that we have discussed in connection with approving the unitary status of school districts such as those in Houston and Fort Worth or in declaring dissatisfaction with the progress of desegregation in Baton Rouge. *See, Ross, supra; Flax v. Potts,* 915 F.2d 155 (5th Cir.1990); *Davis v. East Baton Rouge, supra.* The possibility of creating magnet schools, the existence of a more racially balanced overall population, a stable or growing population, a large tax base—none of those factors is present in Quitman County. White school-age pupils had declined to less than 10% of the Quitman County school population at the time of the district court hearing. If the 110 white children all left the public

---

**6.** The *Ross* formula for unitary status thus expresses a "practicability" test that the Supreme Court implicitly approved. *See Price v. Austin Indep. Sch. Dist.,* 945 F.2d 1307, 1314 (5th Cir. 1991), citing *Ross* and *Dowell,* 498 U.S. 237, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991).

**7.** The dissent asserts that there was insufficient evidence in the record to permit the district

court to ascertain the potential effects of closing Crowder upon the district's overall desegregation and to consider alternatives to closure. We disagree. The court took testimony from two district representatives and five witnesses offered by the plaintiffs, from which a very complete picture of the district emerges.

system after Crowder's closing fewer than 5% white students would remain. The possible reduction from a 10% to 5% white student population, while regrettable, imposes no significant detriment to the pre-existing potential for desegregation.[8] Conversely, taking costly steps to try to retain the additional 5% of white students at Crowder could achieve only a pyrrhic victory in a virtually all-black school system. Further desegregation of the district is not practicable at this time, while closing Crowder had but a minor impact on the racial balance of the district.

For these reasons, we conclude that plaintiff-intervenors did not establish a substantial likelihood that they could prevail on the merits of their case.

Although their failure on this point is sufficient ground to affirm the district court's denial of injunctive relief, we also rely upon the court's assessment of the balance of hardships and the public interest. The court was not clearly erroneous in finding that closing Crowder would enable the district to conserve its scarce financial resources, while leaving the school open would jeopardize the district and thus penalize all of the non-Crowder students. The testimony underlying this finding was earlier noted and, although challenged on some points by plaintiff-intervenors, was not significantly rebutted. Quitman County could not afford to keep open a marginal population school. Doing so would come at the expense of over 90% of the district's students who did not attend Crowder.

This case closely resembles the recent decision of the Eleventh Circuit that permitted closure of a marginally populated school and its consolidation with another school in the district over the objections that this action violated a desegregation decree. *Harris v. Crenshaw County Bd. of Educ.*, 968 F.2d 1090 (11th Cir.1992). Neither there nor here was the board's decision made in defiance of the decree, and in each case it was not economically or educationally sensible to keep a tiny school open.

## CONCLUSION

For the foregoing reasons, the judgment of the district court denying preliminary injunctive relief is *AFFIRMED.*

JUSTICE, District Judge, dissenting.

Enforcement of school desegregation orders has proven among the most nettlesome controversies faced by the federal judiciary. On the one hand, comprehensive and systemic relief has been necessary to remedy school systems subject to generations of *de jure* segregation, and to bring the unlawful dual school systems into alignment with the equal protection guarantees of the Fourteenth Amendment. Yet, on the other hand, independent local control of school systems by school boards, responsive to parent and community needs, is a hallmark of our public education system.[1] Any unnecessary intrusion by the judiciary can only enervate the local school board decision-making process.

The court's majority, while apparently attempting to vindicate the integrity of local school board autonomy, has, notwithstanding, done so at the expense of the federal judicia-

---

**8.** In *Ross*, for instance, this court approved termination of a desegregation decree when 55 out of 226 schools in Houston had a black population exceeding 90%; in *Flax*, this court held that the Fort Worth Independent School District, third largest in Texas, was unitary despite the existence of 14 out of 98 schools in which there were over 80% black students. 915 F.2d at 160–61. In *Flax*, as in this case, a large majority of students were minorities and white flight had been significant. 915 F.2d at 162.

**1.** See *Milliken v. Bradley*, 433 U.S. 267, 280–82, 97 S.Ct. 2749, 2757–58, 53 L.Ed.2d 745 (1977) ("*Milliken II*") ("necessary concern for the important values of local control of public school systems dictates that a federal court's regulatory control of such systems not extend beyond the time required to remedy the effects of past intentional discrimination."); *Board of Education of Oklahoma City v. Dowell*, 498 U.S. 237, 248, 111 S.Ct. 630, 637, 112 L.Ed.2d 715 (1991) ("Local control over the education of children allows citizens to participate in decisionmaking, and allows innovation so that school programs can fit local needs."); *Milliken v. Bradley*, 418 U.S. 717, 742, 94 S.Ct. 3112, 3126, 41 L.Ed.2d 1069 (1974) ("*Milliken I*"); *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 50, 93 S.Ct. 1278, 1305–06, 36 L.Ed.2d 16 (1973). *See also Freeman v. Pitts*, —— U.S. ——, ——, 112 S.Ct. 1430, 1454, 118 L.Ed.2d 108 (1992) (Scalia, J., concurring).

ry's preeminent role: enforcement of constitutional guarantees. Even though the Quitman County School Board's decision to close Crowder Elementary and Junior High School was manifestly at odds with its duty under a 1969 federal desegregation order, neither the school board, nor the district court below, nor the majority's opinion, has purported to reconcile such actions with the 1969 order. For these reasons, and because the district court failed to make mandatory findings of fact and conclusions of law, thereby preventing the appellate court from ascertaining the legal and factual bases for the district court's decision to deny a motion for preliminary injunction, I respectfully dissent.

I. Summary of the Facts

On July 24, 1969, after a finding that Quitman County local school authorities were operating an unconstitutional *de jure* segregated school system, the Honorable William C. Keady, United States District Judge for the Northern District of Mississippi, entered a desegregation order (the "desegregation order"), which has never been set aside.[2] Thus, the United States District Court for the Northern District of Mississippi (the "district court") retains jurisdiction to this day to enforce the terms of, and supervise the Quitman County School Board's compliance with, the desegregation order, including, *inter alia,* actions relating to student school assignments. *Green v. New Kent County School Board,* 391 U.S. 430, 437-38, 88 S.Ct. 1689, 1693-94, 20 L.Ed.2d 716 (1968); *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 26, 91 S.Ct. 1267, 1281, 28 L.Ed.2d 554 (1971); *Davis v. East Baton Rouge Parish School Board,* 721 F.2d 1425, 1435 (5th Cir.1983); *Harris v. Crenshaw County Board of Education,* 968 F.2d 1090, 1094-95 (11th Cir.1992).

In accordance with the obligation imposed on it by the terms of the desegregation order, the Quitman County School Board (the "school board") "petitioned" the district court to close Crowder Elementary and Junior High School ("Crowder"), on March 27, 1991. When appellants, plaintiff-intervenor families of African–American school children attend-

ing Crowder, sought to enjoin the school board from closing it, the district court denied them relief, finding that they failed to state a constitutional claim, and that the school board's felt economic pressures were adequate justification for abandoning Crowder.

In March 1991, when the school board voted to close Crowder, the racial composition of the student body was seventy-three percent Caucasian, and twenty-seven percent African–American. Crowder was, by all standards, the most academically successful and racially balanced school in the district. A 1986 court order had already permitted the school district to close three of its four formerly all-white schools, leaving Crowder, the fourth, as the only remaining school with a significant white population. In contrast, African–American students made up greater than ninety-four percent of the student body at each of the three remaining schools in Quitman County, schools whose academic standing and racial balance fell far short of Crowder's.

The school board admitted that its decision to close Crowder was based on purely economic factors. Sandra Biffle, the school district's secretary, testified at the hearing below that closing Crowder would save the school district $325,860.00. School Superintendent Wright testified that continued operation of Crowder would financially jeopardize the entire school system. As the majority's opinion notes, however, "certain ambiguities and possible omissions from these calculations render uncertain the total amount saved." (Maj. opinion at p. 1452).

Biffle also testified below that if Crowder were closed, nearly all of the 110 Caucasian students attending Crowder would leave the public school system, and that their parents, though remaining in the school district, would enroll them in private schools, rather than send them to one of the other public schools in Quitman County. According to Biffle, the remaining forty African–American students would transfer to one of the three remaining public schools in Quitman County. Moreover, the school board claimed that it

2. Additional desegregation orders were entered on August 28, 1972, and on September 9, 1986.

had no constitutional obligation to remedy the evident racial imbalance, caused by a depleted white student population, since it was caused by independent demographic forces.

## II. Duties of School Board and District Court Under Desegregation Order

Legally sanctioned school segregation is unconstitutional. *Brown v. Board of Education,* 347 U.S. 483, 495, 74 S.Ct. 686, 692, 98 L.Ed. 873 (1954) (racially "[s]eparate educational facilities are inherently unequal."). Where such unlawful segregation is found to exist, federal supervision through the imposition of a desegregation order will be used to remedy the constitutional violations of the local authorities. *Board of Education of Oklahoma City v. Dowell,* 498 U.S. 237, 248, 111 S.Ct. 630, 637, 112 L.Ed.2d 715 (1991). Until the desegregation order is dissolved, the district court has a constitutional duty to enforce the decree by scrutinizing all school board actions, to determine that the offending school district is fulfilling its "affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." *Green,* 391 U.S. at 437–38, 88 S.Ct. at 1694; *Swann,* 402 U.S. at 26, 91 S.Ct. at 1281; *Davis,* 721 F.2d at 1435; *Harris,* 968 F.2d at 1094–95. This supervisory "duty remains enforceable by the district court without any new proof of a constitutional violation." *Freeman v. Pitts,* —— U.S. ——, ——, 112 S.Ct. 1430, 1456, 118 L.Ed.2d 108 (1992) (Blackmun, J., concurring).

The location of new schools and the closure of existing schools require especially close scrutiny by the district court supervising the school district. *Swann,* 402 U.S. at 20–21, 91 S.Ct. at 1278–79. An historical perspective reveals the need for careful consideration, since school closure and school location have been used in the past, and may still be used, as "a potent weapon for creating or maintaining a state segregated school system." *Swann,* 402 U.S. at 21, 91 S.Ct. at 1278. As the Supreme Court has recognized:

> The construction of new schools and the closing of old schools are two of the most important functions of local school authori-

ties and two of the most complex. . . . The result of this will be a decision which, when combined with one technique or another of student assignment, will determine the racial composition of the student body in each school in the system.

*Id.* at 20, 91 S.Ct. at 1278.

The efforts to desegregate a school system do not occur in a static environment, and the district court's duty to supervise the desegregation order, and in particular proposals concerning school closure or location of new schools, must recognize any dynamic population shift which may occur in a school district. As early as the *Swann* case in 1971, the Supreme Court was sensitive to the interdigitation of school closure and demographic responses:

> Over the long run, the consequences of the choices [to close or open schools] will be far reaching. People gravitate toward school facilities, just as schools are located in response to the needs of people. . . . In ascertaining the existence of legally imposed school segregation, the existence of a pattern of school construction and abandonment is . . . a factor of great weight. In devising remedies where legally imposed segregation has been established, it is the *responsibility of local authorities and district courts to see to it that future school construction and abandonment are not used and do not serve to perpetuate or re-establish the dual system.*

*Id.* at 20–21, 91 S.Ct. at 1278–79 (Emphasis added.).

More recently, in 1992, Justice Blackmun, joined by Justices O'Connor and Stevens, focused on the connection between the racial composition of neighborhoods and schools:

> This interactive effect between schools and housing choices may occur because many families are concerned about the racial composition of a prospective school and will make residential decisions accordingly. Thus, schools that are demonstrably black or white provide a signal to these families, perpetuating and intensifying the residential movement.

*Freeman,* —— U.S. at ——, 112 S.Ct. at 1457 (Blackmun, J., concurring) (citing *Swann,*

402 U.S. at 20–21, 91 S.Ct. at 1278–79); *id.* at ——, 112 S.Ct. at 1458 (resegregation may occur, "as neighborhoods respond to racially identifiable schools."); *id.* at ——–——, 112 S.Ct. at 1454–55 (Souter, J., concurring) ("the vestige of discrimination in one factor [*i.e.*, identifiability of a school as "black"], will act as an incubator for resegregation in others.").[3] *See also Keyes v. School District No. 1, Denver, Colorado,* 413 U.S. 189, 202, 93 S.Ct. 2686, 2694, 37 L.Ed.2d 548 (1973); *Columbus Board of Education v. Penick,* 443 U.S. 449, 465 n. 13, 99 S.Ct. 2941, 2950 n. 13, 61 L.Ed.2d 666 (1979).

While school officials have no affirmative Fourteenth Amendment duty to respond to the "purely private acts of those who choose to vote with their feet," *Pasadena County Board of Education v. Spangler,* 427 U.S. 424, 435–37, 96 S.Ct. 2697, 2704–05, 49 L.Ed.2d 599 (1976), the district court and school board have a constitutionally imposed duty to determine whether the prior actions of the school board played a role in encouraging segregation. *See Keyes,* 413 U.S. at 211, 93 S.Ct. at 2699 ("a connection between past segregative acts and present segregation may be present even when not apparent and ... close examination is required before concluding that the connection does not exist."); *Freeman,* —— U.S. at ——, 112 S.Ct. at 1457 (Blackmun, J., concurring) ("[c]lose examination is necessary because what might seem to be purely private preferences in housing may in fact have been created, in part, by actions of the school district.").

The burden of proof is on the school board,[4] before taking any action to close a school while under a desegregation order, to demonstrate (1) that its policies, in the past or present, did not contribute to any current racial imbalance, *Freeman,* —— U.S. at ——, 112 S.Ct. at 1457 (Blackmun, J., concurring); *United States v. Fordice,* —— U.S. ——, ——, 112 S.Ct. 2727, 2735, 120 L.Ed.2d 575 (1992), and (2) that the remaining one-race schools are not vestiges of the prior system. *Swann,* 402 U.S. at 26, 91 S.Ct. at 1281; *Fordice,* —— U.S. at ——, 112 S.Ct. at 2735 ("a State does not discharge its constitutional obligations until it eradicates policies and practices traceable to its prior *de jure* dual system that continue to foster segregation. Thus we have consistently asked whether existing racial identifiability is attributable to the State.").

The district court must, therefore, closely review any proposal to close a school in order to ascertain that school closure is "not used and does not serve to perpetuate or reestablish the dual system." *Swann,* 402 U.S. at 20–21, 91 S.Ct. at 1278–79; *Freeman,* —— U.S. at ——, 112 S.Ct. at 1457 (Blackmun, J., concurring). *See also Monroe v. Bd. of Comm'rs of City of Jackson, TN,* 391 U.S. 450, 459, 88 S.Ct. 1700, 1705, 20 L.Ed.2d 733 (1968); *Dayton,* 443 U.S. at 538, 99 S.Ct. at 2838; *Fordice,* —— U.S. at ——, 112 S.Ct. at 2735.

### III. Failure of School Board and District Court to Fulfill Constitutional Duties

"[I]t is the responsibility of local authorities and district courts to see to it that future school construction and abandonment are not used and do not serve to perpetuate or reestablish the dual system." *Swann,* 402 U.S. at 20–21, 91 S.Ct. at 1279. *See also Keyes,*

---

**3.** Justice Souter filed a separate concurrence in *Freeman* to stress the obligation of a school board and district court to ascertain whether demographic changes were, in fact, causally related to school segregation in the past. *Freeman v. Pitts,* —— U.S. ——, ——, 112 S.Ct. 1430, 1454, 118 L.Ed.2d 108 (1992) (Souter, J., concurring) ("demographic change toward segregated residential patterns [can itself] be caused by past school segregation and the patterns of thinking that segregation creates. Such demographic change is not an independent, supervening cause of racial imbalance in the student body....").

**4.** Where racial imbalances in student attendance zones persist within a school district, there is a presumption that in the "former *de jure* segregated school district ... the board's actions caused [the imbalance], and it is the school board's obligation to rebut that presumption." *Freeman v. Pitts,* —— U.S. ——, ——–—— n. 1, 112 S.Ct. 1430, 1447–1448, 1457 n. 1, 118 L.Ed.2d 108 (1992) (citing *Dayton Board of Education v. Brinkman,* 443 U.S. 526, 537, 99 S.Ct. 2971, 2979, 61 L.Ed.2d 720 (1979)); *Keyes v. School District No. 1, Denver, Colorado,* 413 U.S. 189, 208–11, 93 S.Ct. 2686, 2697–99, 37 L.Ed.2d 548 (1973); *Swann v. Charlotte–Mecklenburg Board of Education,* 402 U.S. 1, 26, 91 S.Ct. 1267, 1281, 28 L.Ed.2d 554 (1971).

413 U.S. at 211, 93 S.Ct. at 2699; *Freeman,* — U.S. at ——, 112 S.Ct. at 1457 (Blackmun, J., concurring). This responsibility demonstrably was not fulfilled by the school board or the district court below.

Given the facts, as described previously, and the affirmative obligations imposed by the Supreme Court on the school board and on the district court, where the board proposes a school closure while still under a desegregation order, the validity of the Quitman County School Board's decision to close Crowder is extremely dubious. The majority's opinion, moreover, only compounds the errors below when it recites, with approval, the factors which the district court considered dispositive in denying to appellants preliminary injunctive relief. In this respect, the district court held that appellants never proved that the school board had an intent to discriminate against African–Americans in closing Crowder, that economic hardship alone could justify closing Crowder, and that racial imbalance and depletion of white students in the school district were caused by independent demographic forces which the school board had no duty to remedy.

It bears emphasis that this appeal does not present the issue of a school district seeking to terminate a desegregation order. Rather, this appeal concerns a school board's proposal to close a school in a school district which is *currently under a desegregation order.* Although the majority's opinion recognizes the posture of this case (Maj. opinion at pp. 1453–54), it inexplicably adopts the legal analysis governing whether a district court should be permitted to relinquish supervision of a desegregation order. *See, e.g., Board of Education of Oklahoma City v. Dowell,* 498 U.S. 237, 249–50, 111 S.Ct. 630, 637–38, 112 L.Ed.2d 715 (1991) (Factors a district court must consider before *dissolving a desegregation order* are: "whether the board had com-

plied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination had been eliminated to the extent practicable."); *Freeman v. Pitts,* — U.S. ——, 112 S.Ct. 1430, 118 L.Ed.2d 108 (1992).[5] The majority's extension of the legal standard governing termination of a desegregation order to this action, involving a school board's petition to close a school while the desegregation order is still extant, lacking, as it does, any foundation or support in precedent, amounts to an unwarranted *ipse dixit.*

### A. The School Board

The majority's opinion mistakenly stresses that appellants proffered no evidence that the Board (three of whose five members were black (Maj. opinion at pp. 1453, 1456)), intended to discriminate in its decision to close Crowder or that it acted in bad faith under the desegregation order: "No party has asserted that any of the Quitman County schools or their attendance zones were affected by deliberately discriminatory line-drawing at any time since the advent of the desegregation decree ... [or] that the board ever violated the desegregation decree or that it was motivated by an intent to resegregate when it unanimously decided to close Crowder." (Maj. opinion at p. 1455).

Intent to discriminate is not a *sine qua non* for a district court's determination that a school board violated a desegregation order in deciding to close a school. *See Swann,* 402 U.S. at 26, 91 S.Ct. at 1281; *Green,* 391 U.S. at 437–38, 88 S.Ct. at 1693–94; *Davis,* 721 F.2d at 1435. The indispensable determination, rather, is whether the school board's proposed actions will perpetuate or recreate a segregated school system. *Freeman,* — U.S. at ——, 112 S.Ct. at 1455 (Blackmun, J., concurring) (original emphasis) ("it is the operation of a racially segre-

---

**5.** The majority opinion in *Freeman* addressed the circumstances under which a district court should be permitted to relinquish control of a school district, rather than the duties of a district court in the face of an outstanding desegregation order. — U.S. at ——, 112 S.Ct. at 1445. However, the concurring Justices in *Freeman* remind the Court's majority that the legal standard governing the closure of a school in a district where a desegregation order remains in

place—as in Quitman County—is governed by an extensive preexisting body of law. *Freeman,* — U.S. at ——–——, 112 S.Ct. at 1456 (Blackmun J., concurring) (citing with approval *Green,* 391 U.S. at 437–439, 88 S.Ct. at 1693–95; *Dayton Bd. of Education,* 443 U.S. at 537, 99 S.Ct. at 2979; *Keyes,* 413 U.S. at 208–211, 93 S.Ct. at 2697–99; *Swann,* 402 U.S. at 26, 91 S.Ct. at 1281).

gated school *system* that must be remedied, not discriminatory policy in some discrete subpart of that system."). *See also Fordice,* —— U.S. at ——, 112 S.Ct. at 2738 (remanding for consideration of effect on desegregation of admission's standards, program duplication, institutional mission assignment, and continued operation of all eight public universities (five white, three black), "even though such policies may be race-neutral on their face.").

The majority's opinion cites a purportedly comparable Eleventh Circuit decision, in which the court affirmed closure of a marginally populated school and its consolidation with another school in the district, over the objections that the school board's action violated a desegregation order. *See Harris v. Crenshaw County Board of Education,* 968 F.2d 1090 (11th Cir.1992). Drawing an inapt analogy, the majority's opinion asserts that, "[n]either there nor here was the board's decision made in defiance of the [desegregation] decree, and in each case it was not economically or educationally sensible to keep a tiny school open." (Maj. opinion at p. 1456).

The *Harris* case is inapposite on several levels. First, the facts are dissimilar. In *Harris,* African–Americans made up seventy percent of the student body at the school which the Crenshaw County School Board sought to close. The student body at Crowder, in contrast, was seventy-three percent white. Whether the school board had a discriminatory intent is a necessary inquiry in cases where the school being closed is composed of a predominantly *minority* student body, as in *Harris,* but not when the school consists of a predominantly white population, as in the case of Crowder. *See Harris,* 968 F.2d at 1095; *Arvizu v. Waco Indep. School Dist.,* 495 F.2d 499, 505 (5th Cir.1974) (school board seeking to close school with predominantly minority population must "adduce evidence sufficient to support the conclusion that [its] actions were not in fact motivated by racial reasons.").

Furthermore, in *Harris,* the school board made an exhaustive inquiry regarding the potential ramifications of closure. The school board, in concluding that the school should be closed and consolidated with another school in the county, explicitly considered the following factors, as required by the outstanding desegregation order in the school district: (1) educational opportunities at both schools; (2) economics; (3) size of student enrollment; (4) the effect of the closure and consolidation on the outstanding federal desegregation order; (5) transportation; and (6) alternatives to closure. *Harris,* 968 F.2d at 1093. The Eleventh Circuit emphasized that consolidation of the schools would actually produce further desegregation. *Id.*

In contrast, closure of Crowder was premised purely on economic savings. The school board admitted that it *never* considered the impact of closure on the desegregation order. (Maj. opinion at p. 1453).[6] The school board, as well, did not attempt to balance the constitutional importance of Crowder's academic prestige and racially balanced student body, nor did it consider any alternatives to closure. Finally, Sandra Biffle, school district secretary, testified below that closure would exacerbate segregation, a *per se* violation of its affirmative duty under the desegregation order. *See Swann,* 402 U.S. at 26, 91 S.Ct. at 1281; *Green,* 391 U.S. at 437–38, 88 S.Ct. at 1693–94; *Davis,* 721 F.2d at 1435. *See also Freeman,* —— U.S. at ——, 112 S.Ct. at 1455 (Blackmun, J., concurring); *Fordice,* —— U.S. at ——, ——, 112 S.Ct. at 2732, 2735.

### B. The District Court

More to the point, the district court erred in failing to scrutinize all school board actions, to determine whether the school district was fulfilling its "affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch," a duty which, to reiterate, remains enforceable without a finding of a further

---

**6.** As set forth in the majority opinion: "There is no dispute that the school board failed explicitly to consider the effect its decision to close Crowder would have on the district court's desegrega-

tion order. Superintendent Wright testified that the district considered only the potential financial benefit of closing Crowder, not its effect on desegregation." (Maj. opinion at p. 1453).

constitutional violation. *Green,* 391 U.S. at 437–38, 88 S.Ct. at 1693–94; *Swann,* 402 U.S. at 20–21, 26, 91 S.Ct. at 1278–79; *Davis,* 721 F.2d at 1435; *Harris,* 968 F.2d at 1094–95; *Freeman,* —— U.S. at ——, 112 S.Ct. at 1456 (Blackmun, J., concurring).

The district court also erred in failing to establish whether the current racial imbalance was attributable to prior *de jure* segregation in Quitman County, or even to later violations by the school board. While the school board has no affirmative obligation to remedy a racial imbalance caused by independent demographic forces, *i.e.,* people "voting with their feet," the district court and school board unquestionably *do* have a constitutionally imposed duty to make a threshold determination of whether the school board played a role in encouraging residential segregation. *See Keyes,* 413 U.S. at 211, 93 S.Ct. at 2699; *Freeman,* —— U.S. at ——, 112 S.Ct. at 1457 (Blackmun, J., concurring); *id.* —— U.S. at ——, 112 S.Ct. at 1454 (Souter, J., concurring); *Swann,* 402 U.S. at 20–21, 91 S.Ct. at 1278–79. Without a determinate answer to these inquiries, it is at best premature, and at worst disingenuous, to conclude that the racial imbalance in the Quitman County school district was caused solely by independent demographic forces,

and thus that the appellants failed to state a constitutionally cognizable claim.

## IV. Standard of Review

Inasmuch as the district court unequivocally failed to address the relevant legal standard in evaluating the school board's closure of Crowder, neglected to ascertain whether the school board met its burden of proof, relied on an incomplete factual record, and fell short of its duty to make adequate findings of fact and conclusions of law, as required by Rule 52(a) [7], the opinion of the district court must be reversed.

On appeal, a preliminary injunction order may be set aside if based upon a clearly erroneous factual determination, an error of law, or an abuse of discretion. *Roho, Inc. v. Marquis,* 902 F.2d 356, 358 (5th Cir.1990); *Hay v. Waldron,* 834 F.2d 481, 484–85 (5th Cir.1987).

The majority's opinion restricts its review to whether the district judge abused his discretion in denying preliminary injunctive relief. The district judge's discretion, however, is not unbridled, and a preliminary injunction "must be the product of reasoned application of the four factors held to be necessary prerequisites [to a preliminary injunction]." *Enterprise Int'l, Inc. v. Corporacion Estatal*

---

**7.** The district court below made no findings of fact or conclusions of law with regard to the second and third prerequisites to preliminary injunctive relief, *i.e.,* the risk of irreparable injury if the injunctive relief is not granted, and whether the threatened injury outweighs harm to defendant that may result from the injunction. *See Roho Inc. v. Marquis,* 902 F.2d 356, 358 (5th Cir.1990). In conformity with Fed.R.Civ.P. 52(a), a district judge is required to make findings of fact and conclusions of law when he or she "grants or denies a preliminary injunction," and normally the order is vacated and remanded for appropriate findings if the district judge fails to do so. *See 5A, Moore's Federal Practice* para. 52.06[1], at 52–133 (1993) ("Moore's") ("When the trial court fails to make findings, or to find on a material issue, the appellate court will normally vacate the judgment and remand the action for appropriate findings to be made. The same is true where the findings of fact and conclusions of law are mere conclusory statements and do not fully address all the issues raised in the litigation."); Pt. 2—7 Moore's para. 65.21, at 65–174; 9 Wright & Miller § 2576, at 695–96; 11 Wright & Miller § 2962, at 637–38 and n. 45. *See also Chandler v. City of Dallas,* 958 F.2d 85,

88–89 (5th Cir.1992) (appeal from employment discrimination bench trial, vacating and remanding where district court failed to set forth in a sufficiently definite manner its findings of fact and conclusions of law, as required by Rule 52(a), thereby preventing the appellate court from ascertaining the factual and legal bases for the district court's opinion.); *In re Incident Aboard the D/B Ocean King,* 758 F.2d 1063, 1072 (5th Cir.1985) (vacating and remanding where district court failed to provide appellate court with findings of fact and conclusions of law sufficient to review the ultimate disposition of the case).

The order of the district court denying appellants' injunctive relief should, at a minimum, be vacated and remanded for further factual findings and legal conclusions, specifically with reference to the risk of irreparable injury, and whether the threatened injury outweighs harm to defendant school district that may result from an injunction. Without conclusions of law and findings of fact regarding these material issues, mandatory under Rule 52(a), this court cannot properly review whether appellants satisfied the second and third prongs for preliminary injunctive relief.

*Petrolera Ecuatoriana* (*"C.E.P.E."*), 762 F.2d 464, 472 (5th Cir.1985) (quoting *Florida Medical Ass'n v. H.E.W.*, 601 F.2d 199, 202 (5th Cir.1979)); *Buchanan v. United States Postal Service*, 508 F.2d 259 (5th Cir.1975) (findings on all four factors are mixed law-fact questions); *Canal Authority v. Callaway*, 489 F.2d 567, 572 (5th Cir.1974). *See generally United States Steel Corp. v. Fraternal Ass'n of Steelhaulers*, 431 F.2d 1046, 1048 (3d Cir.1970), *quoted in* 11 Wright & Miller, *Federal Practice and Procedure:* Civil § 2962, at 633 (1973 & West Supp.1992) ("Wright & Miller").

Findings of fact must ordinarily be upheld unless clearly erroneous. *C.E.P.E.*, 762 F.2d at 472; 11 Wright & Miller § 2962, at 635–36. Fact-findings on constitutional questions, however, are sometimes left for independent appellate review, and not subject to the clearly erroneous standard. *See, e.g., Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 501–502, 104 S.Ct. 1949, 1959–60, 80 L.Ed.2d 502 (1984) (appellate courts maintain independent record review over district judge's determination of "actual malice" in defamation cases involving assertions of First Amendment privilege). *See also* Stephen A. Childress & Martha S. Davis, *Federal Standards of Review* § 2.19 (2d ed. 1992) ("Childress & Davis"). (Citations omitted.).

In reviewing a preliminary injunction, a court's conclusions of law "are subject to broad review and will be reversed if incorrect." *C.E.P.E.*, 762 F.2d at 473; *Apple Barrel Productions, Inc. v. Beard*, 730 F.2d 384, 386 (5th Cir.1984); *Commonwealth Life Ins. Co. v. Neal*, 669 F.2d 300, 304 (5th Cir.1982); 11 Wright & Miller § 2962, at 636–37. An adjudication respecting whether a likelihood of success on the merits exists, insofar as it rests on a conclusion regarding the existence *vel non* of a constitutionally cognizable claim, is usually reviewed freely by the appellate court. *See* Childress & Davis § 4.17 ("Reversal may be appropriate, for example, when the trial court used the wrong legal standard or misunderstood the substantive law on the underlying issues."). (Citations omitted.).

It follows that the district court's error, in failing to apply the proper legal standard to determine the constitutionality of closure of a school where the school district is under a desegregation order, necessitates that its decision be reversed on this ground.

The clearly erroneous determination of the district court that keeping Crowder open would harm the public is likewise reversible error, because of the district court's failure (1) to clarify the ambiguities and omissions in the evidence presented by the school board regarding savings, (2) to take into account costs of closure, as well as alternatives to closure (such as alternative attendance zones, rezoning, or an increase in the tax rate [8]), (3) to consider closure of one of the other schools, rather than Crowder, and (4) to weigh the impact of closure on the desegregation order.

Finally, the district court's neglect to make the requisite findings of fact and conclusions of law in denying preliminary injunctive relief, as required by Fed.R.Civ.P. 52(a), dictates, at the very least, vacation and remand of the judgment below.

## V. Conclusion

The constitutional rights of African–American school children pronounced by *Brown* permit no less than requiring the school board and the district court to fulfill their constitutional obligations under the desegregation order. Integrated schools are no less desirable because they are burdensome to achieve; and integrated schools remain a constitutional requirement, even though *Brown*'s thirty-nine year old mandate is still to be fulfilled. *Brown*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

While courts may not be "in the business of enforcing useless measures" (Maj. opinion at p. 1455), courts are surely in the business

---

**8.** One example of an alternative to closing Crowder is found in *Missouri v. Jenkins*, 495 U.S. 33, 57, 110 S.Ct. 1651, 1666, 109 L.Ed.2d 31 (1989), where the Court held that "a local government with taxing authority may be ordered to levy taxes in excess of the limit set by state statute where there is reason based in the Constitution [*i.e.,* the Fourteenth Amendment duty to operate a unitary school system] for not observing the statutory limitation."

of enforcing the Constitution. To the majority of this court, granting appellants injunctive relief to keep Crowder open would be a "pyrrhic victory," a victory gained at too great a financial cost. (Maj. opinion at p. 1456). But closing Crowder, the most academically successful and racially balanced school in an otherwise predominantly African–American school system, would, in my opinion, be a much greater loss—a stripping away of the constitutionally protected rights of African–American school children, a grievous injury which would convey a message of "inferiority as to the status [of African–American school children] in the community that may affect their hearts and minds in a way unlikely to be undone." *Brown*, 347 U.S. at 494, 74 S.Ct. at 691.

The judgment of the district court denying preliminary injunctive relief should be reversed, and this civil action remanded to the district court, in order that it may, in accordance with the proper legal and factual inquiry set forth above: (1) require the school board to consider the impact of closing Crowder on the outstanding desegregation order; (2) determine whether closure would violate the outstanding federal desegregation order by recreating and perpetuating one-race schools; and (3) ascertain whether the residential segregation and predicted "white flight" are influenced by prior *de jure* segregation and the accompanying attitudes and patterns of thought accompanying this system. Finally, (4) the district court must be satisfied that the school board has adequately considered other remedial alternatives to closure.

In the alternative, the judgment of the district court should be vacated and remanded, in order that it may make the findings of fact and conclusions of law required by Fed. R.Civ.P. 52(a).

For the reasons stated above, I respectfully dissent.

