# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

April 18, 2019

Lyle W. Cayce
Clerk

No. 18-30115

M.C. MOORE, as father and next friend to minors Joyce Marie Moore, Jerry Moore, and Thelma Louise Moore; HENRY SMITH, as father and next friend to minors Bennie Smith, Charles Edward Smith, Shirley Ann Smith, and Earline Smith,

> Plaintiffs-Appellees,

v.

TANGIPAHOA PARISH SCHOOL BOARD, a corporation,

> Defendant-Appellant

Appeal from the United States District Court
for the Eastern District of Louisiana

Before KING, HIGGINSON, and COSTA, Circuit Judges.

GREGG COSTA, Circuit Judge:

In recent years the Tangipahoa Parish public schools have made significant strides toward achieving a "unitary school system" free of the vestiges of de jure segregation that prompted this desegregation case more than a half century ago.

In 2011, the district court granted the school system "conditional unitary status" in extracurricular activities. The condition was that the court would retain jurisdiction over extracurricular activities for one school year. So long as the court was not presented with evidence of discrimination during the

No. 18-30115

probationary period, it would declare the district "unitary" (that is, grant "final unitary status") in that area and relinquish its control. It did just that in 2012.

In 2015, the district court took a similar tack for staff assignments. Finding that the district had worked for years to achieve the court's goals in that area, the court "provisionally granted" unitary status to the school district for staffing decisions.

This appeal arises from the district court's 2017 decision to grant "provisional" unitary status in another area: facilities. The court set a two-year probationary period, during which it would retain jurisdiction over that aspect of the desegregation order and the school district would face semiannual compliance reviews. At the end of the two years, the court would consider an "unconditional" grant of unitary status in facilities.

This time the Board appealed.[1] It argues that a probationary period is not allowed when a court takes an incremental approach to unitary status. If that is not true, the Board argues it was not justified in this case.

Requiring a probationary period before final dismissal of a desegregation case is a longstanding practice in this circuit. The so-called "*Youngblood* procedure" arose when this court concluded that a district court had made a premature finding of unitary status. *Youngblood v. Bd. of Pub. Sch. Instruction of Bay Cty., Fla.*, 448 F.2d 770, 771 (5th Cir. 1971). We ordered the district judge to reopen the case and retain jurisdiction "for a period not less than three school years." *Id.* During those years, the school district was required to update the court on its compliance. *Id.* After three years, the court would be permitted to consider dismissal of the desegregation case after a hearing. *Id.* In the years since *Youngblood*, many courts have followed its

---

[1] So did the plaintiffs, apparently challenging the decision to grant even provisional unitary status. But they failed to file a brief.

procedure as a final step to ensure full compliance before ending court supervision. *See, e.g.*, *Price v. Austin Indep. Sch. Dist.*, 945 F.2d 1307, 1311 n.4 (5th Cir. 1991); *Monteilh v. St. Landry Parish Sch. Bd.*, 848 F.2d 625, 629 (5th Cir. 1988); *Ross v. Houston Indep. Sch. Dist.*, 699 F.2d 218, 227 (5th Cir. 1983).

But the Board argues the *Youngblood* procedure should not be allowed as a step on the path to declaring unitary status when unitary status is being determined in an incremental manner. *Youngblood* involved a global inquiry into whether a school district had complied with the whole of a desegregation order. That overall finding of unitary status looks at whether a district is still afflicted with the vestiges of segregation across a number of areas: not just student assignment, but also staff composition, faculty makeup, transportation, extracurricular activities, and facilities. *Green v. Cty. Sch. Bd. of New Kent Cty., Va.* 391 U.S. 430, 435 (1968) (listing these factors); *see also Anderson v. Sch. Bd. of Madison Cty.*, 517 F.3d 292, 298 (5th Cir. 2008) (same). In 1992, the Supreme Court allowed district courts to consider unitary status in a piecemeal manner when the school system had eliminated discrimination for one or more but not all of the *Green* factors. *Freeman v. Pitts*, 503 U.S. 467 (1992) ("A federal court . . . has discretion to order an incremental or partial withdrawal of its supervision and control."). We had blessed the same practice a couple years earlier. *Flax v. Potts*, 915 F.2d 155, 158 (5th Cir. 1990). The Board contends that this now-common incremental, or subject-by-subject, approach to unitary status is incompatible with a *Youngblood* probationary period.

The short answer to this is that *Freeman* said nothing about provisional (that, is probationary or conditional) grants of unitary status. That answer is also dispositive: "[F]or a Supreme Court decision to change our Circuit's law,

it 'must be more than merely illuminating with respect to the case before [the court]' and must 'unequivocally' overrule prior precedent." *Tech. Automation Servs. Corp. v. Liberty Surplus Ins. Corp.*, 673 F.3d 399, 405 (5th Cir. 2012) (quoting *Martin v. Medtronic, Inc.¸* 254 F.3d 573, 577 (5th Cir. 2011)).

What is more, our early cases allowing the incremental approach to unitary status endorsed the *Youngblood* procedure. Most notably, in rejecting the Fort Worth NAACP's challenge to a district court decision that the city's schools had achieved unitary status, we noted the "three-year *Youngblood* period" would allow the district court to make a final determination whether the school system had eliminated the vestiges of discrimination in hiring and assigning teachers. *Flax*, 915 F.2d at 163; *see also United States v. Overton*, 834 F.2d 1171, 1177 & n.20 (5th Cir. 1987) (noting that the Austin school district had been subject to a three-year *Youngblood* period in rejecting an attempt to reopen that desegregation case).[2] And the circuit that we followed when adopting the incremental approach to unitary status, *Morgan v. Nucci*, 831 F.2d 313 (1st Cir. 1987), *cited in Flax*, 915 F.2d at 158, later approved use

---

[2] *Hull v. Quitman County Board of Education* is not to the contrary. 1 F.3d 1450 (5th Cir. 1993). It does not address the relinquishment or retention of jurisdiction over desegregation decrees. *Id.* at 1451–52 (addressing whether district court abused its discretion in refusing to enjoin closure of only remaining white majority elementary school in district). And *Hull*'s discussion of *Freeman*—citing it for the principle that "lower courts *have discretion* to terminate a desegregation case if a school board has consistently complied with a court decree in good faith," *id.* at 1454 (emphasis added)—if anything supports a district court's ability to use a probationary period before issuing a final ruling on compliance.

Nor does *United States v. Midland Independent School District* prohibit the use of the *Youngblood* procedure when courts take an incremental approach to unitary status. 48 F. App'x 102 (5th Cir. 2002) (per curiam). That unpublished opinion rejected an appeal of a district court ruling that dismissed the remaining five areas of court supervision without holding a final compliance hearing. In finding no abuse of discretion in the refusal to hold that final hearing, we noted that the incremental method can "attain[] the same substantive goals achievable by using the *Youngblood* procedures." *Id.* at *1. But recognizing that the *Youngblood* procedure is not always necessary—something that is true whether a court is engaging in a global or incremental approach to unitary status—does not mean it is no longer within a district court's discretion in deciding whether a school system has achieved unitary status.

of a *Youngblood* probationary period before the district court ended oversight of teacher assignments in Boston schools, *Morgan v. Burke*, 926 F.2d 86, 91 (1st Cir. 1991) (explaining that this "limited monitoring" was supported by our *Youngblood* procedure (citing *Ross*, 699 F.2d at 227)).

These cases recognize that there is no tension between *Youngblood*'s probationary period and *Freeman*'s incremental approach to finding unitary status. Indeed, a provisional grant of unitary status is itself "an incremental or partial withdrawal of [a court's] supervision and control." *Freeman*, 503 U.S. at 489. A district court's discretion to gradually relinquish jurisdiction rather than make all-or-nothing decisions is central to *Freeman*. *Id.* at 490 (noting that a court must "provide an orderly means for withdrawing control when it is shown that the school district has attained the requisite degree of compliance" and that "[a] transition phase in which control is relinquished in a gradual way is an appropriate means to this end"). Both when it uses a *Youngblood* probationary period and when following *Freeman*'s incremental approach, a court is breaking up the ultimate finding of unitary status into smaller steps rather than making that decision in one fell swoop. These gradual approaches help reduce the level of court oversight before the court determines the school system has achieved global unitary status and the court's supervision ends for good. And in at least one sense the *Youngblood* period is less burdensome for a school system on the brink of achieving unitary status in just one area, like facilities, than it is when it poses the final obstacle to global unitary status: In the former situation, the probationary period is not all that stands between the district and getting completely out from under court oversight; the case remains pending because in other areas—student assignment in this case—the district has not yet eliminated the effects of discrimination.

No. 18-30115

The Board's contrary view that *Freeman* forbids the probationary period we have long endorsed may reflect a misunderstanding of what the *Youngblood* procedure means. The Board is correct that a district court's supervision should end once it makes a final determination of unitary status. *Bd. of Educ. of Okla. City Pub. Sch. v. Dowell*, 498 U.S. 237, 248 (1991); *see also Overton*, 834 F.2d at 1174. The disconnect is that a district court's decision to impose a *Youngblood* period reflects its view that a final determination of good faith compliance is not yet possible. Nomenclature may be the source of the confusion. As this court has stated, there is no longer any magic to the phrase "unitary status." *Hull*, 1 F.3d at 1454. The district court here "granted provisional unitary status in the area of facilities." "Provisional" is the key. It would have been clearer not to accompany that word with "a grant of unitary status," but we have elsewhere recognized that an order using those words can be read as no grant at all. *See Thomas v. Sch. Bd. St. Martin Parish*, 756 F.3d 380, 387 & n.23 (5th Cir. 2014) (holding that the retention of jurisdiction meant that a court order was not a full and final declaration of unitary status despite a finding that the district had "achieved a unitary school system"). Indeed, the district court's order was explicit that it would later consider granting "final" unitary status. Also removing any doubt is the court's explanation that it needs additional limited oversight during "a two-year probationary period" before concluding that the school system has "demonstrated, to the public and to the parents of the once disfavored race, its good-faith commitment to the whole of the court's decree." *Freeman*, 503 U.S. at 491.

We thus reject the Board's legal challenge to the *Youngblood* procedure. A district court has long had discretion to impose a *Youngblood* period, and the Board cites nothing that would allow us to depart from that settled law.

6

That leaves the Board's argument that use of a probationary period was not justified under the facts of this case. Its view that the district court relied on insufficient evidence of ongoing discrimination stems from the same misreading of the district court's order that we have just discussed. The district court did not make a new and independent finding of discrimination after concluding that the Board had fully complied with the desegregation decrees. In other words, as the district court emphasized, it did not make a finding of bad faith. Instead, the district court was deciding whether the Board has met its burden of establishing, among other things, that it had demonstrated good faith commitment to complying with the court's orders. *Id.*; *see also Missouri v. Jenkins*, 515 U.S. 70, 88–89 (describing a "good faith commitment to the whole of the court's decree" as part of "the showing that must be made by a school district . . . for complete or partial relief" from that decree). The district court concluded that the Board had gotten most of the way there, but that some doubt remained, warranting a two-year probationary period. In relying on the Board President's comments to find that the Board came up a bit short of demonstrating good-faith compliance, the district court made a judgment call. We see no clear error with that determination in this long-pending desegregation case with which the district court is intimately familiar. *United States v. Fletcher*, 882 F.3d 151, 155, 157 (5th Cir. 2018) (noting that if a district court's factual finding on good faith "is plausible in light of the record" it should not be disturbed); *Anderson*, 517 F.3d at 296 (recognizing that a district court's findings "are entitled to great deference" in desegregation cases, especially when the district judge has "supervised the case for many years" (cleaned up)).

The judgment of the district court is AFFIRMED.